## Alfred Harlev v. Sanitary District of Chicago.

1. FORFEITURES—*Right Must be Clearly and Unquestionably Established.*—Forfeitures are not favored by the law, and when the right thereto is asserted, such right must be clearly and unquestionably established before the courts will enforce them.

2. SAME—*For Failure to Comply With the Contract " As to Progress and Character of the Work Done."*—Under a contract providing for a forfeiture in case of a failure to comply with the contract " as to progress and character of the work done," neither the one nor the other, separately, is cause for a declaration of forfeiture. The default must be as to both together.

3. PRACTICE—*When a Case Should be Submitted to a Jury.*—A case should be submitted to the jury if the evidence all considered, without reference to any question of conflict in it, is such that the jury could, without acting unreasonable in the eye of the law, have decided in favor of the plaintiff.

4. CONTRACTS—*Prepared Solely by One of the Parties—Rule Contra Proferentem.*—Where a contract is prepared solely by one of the parties, ambiguous phrases contained in it must be construed strictly against the party who prepared it.

5. SAME—*To be Valid Must be Binding upon Both Parties.*—A provision in a contract between a contractor and a corporation, whereby the decision of the latter's chief engineer, as to the rate of progress and character of the work, is made final and binding upon the contractor, but reserves the right in the corporation to reject his decision if his certificate as to the contractor's compliance with the terms of the agreement was improperly given, is of no effect. A contract of this kind, to be valid, must be binding upon both the parties.

6. WORDS AND PHRASES—*Meaning of "Possible."*—A contract contained the following provision:

" Provided, that only such work as building levees, changing river channels, grading roadbeds and other subsidiary work, where the necessary land has been acquired, shall be required of said contractor until it is possible to open the main excavation at the best point from which to execute the said work."

*Held,* that the word "possible" should be construed as meaning " practicable."

Assumpsit.—Appeal from the Superior Court of Cook County; the Hon. AXEL CHYTRAUS, Judge presiding. Heard in this court at the March term, 1902. Reversed and remanded. Opinion filed January 26, 1903. Rehearing denied April 23, 1903.

**Statement.**—In the year 1892 the appellee, pursuant to the purposes of its incorporation, undertook to construct what is known as the Drainage Canal, and for a part, viz: section 1 thereof, under date July 12, 1892, as party of the first part, entered into a contract with Alfred Harlev, as party of the second part, the appellant, which, omitting the formal commencement, conclusion and parts thereof that are in no way material or brought in question in this case, is as follows:

" Witnesseth: That the said party of the second part has covenanted, contracted and agreed and by these presents does covenant, contract and agree with said party of the first part, for the consideration of the payments to be made as provided for herein, to the said party of the second part, by the said party of the first part, and under a penalty expressed in a bond bearing even date herewith, at his own proper cost and expense to do all the work, and to furnish all material, tools, explosives, labor and all appliances and appurtenances called for by this agreement, in the manner and under the conditions hereinafter stipulated, that are necessary to the complete excavation and entire removal of earth, rock, glacial drift and other material from that

portion of the said main drainage channel, known and dis-
tinguished by the specifications herein contained, and the
plans accompanying them, as section one (1), together with
the building of all collateral works, which by the terms of
this contract are included in the same  *  *  *.  It is
further covenanted, contracted and agreed that the work
shall be executed under the direction and supervision of
the chief engineer of the Sanitary District of Chicago, and
such assistants, superintendents and inspectors as the chief
engineer may appoint, and by whose measurements and
calculations the quantities and amounts of the several kinds
of work performed under this contract shall be determined,
and on whose inspection all work shall be accepted or con-
demned.    The said chief engineer and his assistants and
inspectors shall have full power to reject or condemn all
materials furnished or work performed under this contract
which do not fully conform to its spirit and to the terms
and conditions herein expressed, and the chief engineer
shall decide every question which may arise between the
parties hereto relative to the execution thereof, and his
decision shall be final and binding upon both parties.

"SPECIFICATIONS.

"1.—Location.—The work covered by and included in
these specifications is the excavation of that part of the main
drainage channel and the building of certain collateral works
for the Sanitary District of Chicago, located between the
Willow Springs road, in section 32, etc.  *  *  *  Begin-
ning below, but near the said Willow Springs road, the said
part of said main drainage channel follows the Desplaines
river valley, being located north and west of the Illinois
and Michigan Canal, approximately, as shown on the accom-
panying plans marked '2 a,' and as shall be located by the
engineer, and described as follows :

"The line of said channel shall begin at Willow Springs
road and shall continue in a direction parallel to and 460
feet from the river bank of the canal above Willow Springs,
joining by an easy curve a line parallel to and 460 feet
from the canal bank in the straight reach above Sag,
thence by an easy curve in a straight course to the county
line and parallel to and 730 feet from the bank of the canal
in the straight reach at and above Lemont, thence by an
easy and continuous curve to a straight course parallel to
and 460 feet from the canal bank in the straight reach at
and below Romeo, said course terminating at or near the
middle of section 14, of Lockport township, the course
opposite Lemont to be subject to a change of 200 feet if

found desirable, said course being so located as to facilitate the spoiling of the waste material from the channel on either side. The total approximate length is 74,000 feet, or fourteen miles.

"2.—Sections.—For the purpose of conveniently designating different portions of the work, and of dividing it into contracts, the said part of the main drainage channel shall be divided into fourteen sections, as follows:

"Section 1. Extending from the station designated 740 to station designated 800.

"Sections 1, 2, 7, 8, 9 and 10 involve certain changes in the river channel opposite. * * *

"7.—River Diversion.—In sections hereinbefore specified, the contractor is to change the course of the Desplaines river within the limits of the right of way in the manner shown on plan '2 a,' the south boundary of said course when changed to be no where nearer to the center line of the channel than 360 feet.

" The diversion channel in each case is to be excavated to one foot below the level of low water in the river, and to a width of 200 feet, with slopes of one to one. All the material from the excavation in each section is to be wasted in the south side of the new river channel, except as otherwise permitted by the engineer. That portion of the river diversion channel in each respective section is to be classed as belonging to that section.

"8.—Clearing and Grubbing.—The contractor will be required to remove all trees, stumps, buildings, fences or other incumbrances within 150 feet of the center line of the channel, or that may be in the way of any collateral or subsidiary work herein specified. All such material of value shall be the property of the contractor, and all worthless material shall be disposed of as directed by the engineer. The cost of this work shall be included in the prices for excavation as hereinafter stated.

"9.—Levee.—The said contractor shall build at his own cost and expense all or any levees which may be necessary to protect the work, provided for in this contract, during the progress of the same. And should flooding occur, either before or after the building of any such levees, any and all expenses and damages to which he may be put shall be borne by the said contractor. * * *

"18. The prices given herein are to include all work herein specified, as clearing and grubbing levees for protection, pumping, roadways for working, back filling of

retaining walls, and generally all work and material found necessary in prosecuting this contract. * * *

"20.—Responsibility of Contractor.—All the work provided for in this contract is to be done under the direction and supervision of the chief engineer and his properly authorized agents. He is to be guided by the lines, stakes, marks and grades given by them. * * *

"The contractor will be required to give his personal attention to the fulfillment of this contract and to the execution of the work. He is to keep the same under his control, and will not be allowed to sublet all or any part of it, it being distinctly understood and agreed that the subletting of the work covered by this contract or any part thereof, shall work a forfeiture of the contract at the option of the Sanitary District. * * *

"In case the contractor fails to comply with the provisions of this contract, as to progress and character of work, he shall be duly notified in writing, and thirty days after the giving of said notice the party of the first part may declare this contract forfeited, if there is substantial failure to comply with its provisions. * * *

"6.—Time.—The contractor agrees to begin work within 30 days after the execution of this contract or as soon after the expiration of the said 30 days as the Sanitary District shall have acquired title to the necessary right of way, and shall have notified the said contractor to begin. He agrees to carry it on at such points, and in such order of procedure as the time and manner of procuring the said right of way may render necessary. Provided that only such work as building levees, changing river channels, grading road beds and other subsidiary work where the necessary land has been acquired, shall be required of said contractor until it is possible to open the main excavation at the best point from which to execute the said work; and, provided, that the said contractor agrees not to proceed to the execution of any part of the work until he shall have been notified by the said Sanitary District to proceed therewith.

"All the work provided to be done under this contract shall be completed and ready for inspection on or before the 30th day of April of the year 1896, provided that if for any reason the contractor is not permitted by the Sanitary District to begin the main excavation of the said channel on or before the 1st day of August, 1892, then the said Sanitary District agrees to extend the time for the completion of this contract as much beyond the time specified

for its completion as the time of beginning the main work shall be subsequent to the 1st day of August, 1892.

" The work done each month shall not be less than such proportion of the whole work as one month bears to the total number of months agreed upon for the completion of said work; provided, that the first, four months after notice to begin shall be considered as one month, and the last two months before date of completion as one month. \* \* \*

" H.— Prices.—In consideration of the said work being carried on and completed in time and manner as hereinbefore specified, the said party of the first part agrees to pay to the said party of the second part the following amounts for each kind of work, respectively, and the said party of the second part agrees to receive and accept the same as full compensation for the performance of the work, including the furnishing of the material, tools, labor, etc., to-wit :

" a.—For each cubic yard of ' glacial drift ' excavated as per the terms of this contract, the sum of No and 27-100 dollars ($0.27).

" b.—For each cubic yard of ' solid rock ' excavated, as per the terms of this contract, the sum of No and $83\frac{1}{2}$-100 dollars ($0.83$\frac{1}{2}$).

" c.—For each cubic yard of ' dry rubble masonry, measured in the wall (actual geometrical contents) the sum of One and $37\frac{1}{2}$-100 dollars ($1.37$\frac{1}{2}$).

" I.—Time and Manner of Payment.—It is agreed by the party of the first part, that on or before the 10th and 25th days of each month, during the progress of the work, and subject to the provisions hereinbefore specified under the head of ' Time,' that payment will be made to the said party of the second part to the amount of $87\frac{1}{2}$ per cent of the contract price of the approximate amount of work done during the previous half month, upon written certificates from the engineer that such approximate amount of work has been done during that period, $12\frac{1}{2}$ per cent being reserved until the completion and acceptance of the whole work. \* \* \*

"K.—Liquidated Damages.—It is agreed by the said party of the second part that should he fail to prosecute or complete the work in time and manner as specified herein and in full accordance with the terms of this contract, then said first party may, at its election, terminate this contract, and in such case the said reserve of $12\frac{1}{2}$ per cent to be forever retained by the said party of the first part as liquidated damages for his failure to so prosecute or complete said work. \* \* \*

" M.—Failure to Complete.—It is further agreed by the said party of the second part that if the work to be done under this contract shall be abandoned, or if it shall be assigned by him, or if he lose control of the work from any cause, or if the rate of progress is not such as to insure its completion within the time specified, or, if at any time the engineer shall be of the opinion, and shall so certify in writing to the said party of the first part that said work or any part thereof, is unnecessarily and unreasonably delayed, or that the contractor is willfully and persistently violating any of the conditions or covenants of this contract, or is fulfilling said contract in bad faith, the party of the first part shall have the power to notify said contractor to discontinue all work or any part thereof, as may be designated by said party of the first part, and the said party of the first part shall thereupon have the power either to complete said work by contract or to employ such men and teams, and to obtain such machinery, implements and tools, and to purchase such material as the said engineer may deem necessary to complete the work herein described, or any part thereof. And in so doing said engineer may use such tools, implements and materials as may be found upon the line of said work. The cost of doing such work shall be charged to the said contractor, and the expense so charged shall be deducted and paid by the said party of the first part out of such moneys as may be due, or may at any time thereafter become due, to said contractor, under and by virtue of this contract, or any part thereof, and the balance, if any, shall be paid by said contractor on demand.
\*    \*    \*

" N.—The said party of the second part further agrees that he shall not be entitled to demand or receive payment for any portion of the aforesaid work or materials except in the manner set forth in this agreement, nor until each and all of the stipulations hereinbefore mentioned are complied with, and the said chief engineer shall have given his certificate to that effect; whereupon the said party of the first part will, at the expiration of thirty (30) days after such completion and the delivery of such certificate, pay, and it hereby binds itself to pay, the said party of the second part, in cash, the whole amount of money accruing to said second party under this contract, excepting such sum or sums of money as may be lawfully retained under any provisions of this contract hereinbefore set forth. Provided, that nothing herein contained shall be construed to affect the

right hereby reserved of the said party of the first part to reject the whole or any portion of the aforesaid work should the said certificate be found to be inconsistent with the terms of this agreement or otherwise improperly given."
* * *

Attached to the contract is an approximate estimate of the different amounts of material to be excavated from the canal, of filling behind retaining walls and amount in cubic yards of retaining walls to be constructed in, among others, said section 1. This estimate shows the excavation in said section 1 to be the following amounts in cubic yards, viz: glacial drift, 1,061,719; solid rock, 404,200; glacial drift in river diversion, 206,398, and filling behind retaining walls 72,888; also 54,129 cubic yards of retaining walls to be constructed.

To secure the performance of said contract said Harlev, with sureties, made a bond to the appellee, in the penal sum of $100,000. Harlev did some work under his contract in the fall of 1892 by way of clearing the canal right of way of timber and underbrush, but no excavation of consequence was done until June, 1893, for reasons which will appear in the opinion. In work upon that part of the contract known as the river diversion, Harlev found it to be more expensive to excavate than he anticipated, and as a result of negotiations between him and the appellee, and after he had excavated some 6,000 yards of glacial drift from the river diversion, he, on August 30, 1893, made another agreement with appellee, by which he undertook, as agent of appellee, to superintend and conduct the work of excavating the river diversion, he to employ the men and furnish the tools, cars and machinery necessary to do the work, for all of which the appellee compensated him according to the terms provided in the agreement, which, among others, had the following provision:

"It is further agreed that the making and performance of this agreement shall in no way whatsoever interfere with or prejudice the rights of either party in reference to an existing controversy between first party and Alfred Harlev in reference to a certain contract for work upon said contract, section one."

Under the above agreement the remainder of the work on the river diversion was done, the work being completed by November 16, 1893.

Harlev proceeded with the work upon the main channel of the canal, though there was complaint from time to time by the appellee and its representatives as to the rate of progress he was making, commencing actively as early as June, 1893, and continuing until February 10, 1894, when, pursuant to a communication dated February 6, 1894, by appellee's chief engineer to its board of trustees, to the effect that Harlev has shown an inability or unwillingness to make progress in his work, and recommending that his contract be declared forfeited, said board of trustees passed a resolution concurring in the recommendation of the engineer and an accompanying report of the committee on engineering and finance of said trustees, and declaring his said contract forfeited on account of the failure of said Harlev to comply with its provisions. Previous to this resolution, on December 28, 1893, the appellee, by its clerk, had given notice to Harlev to the effect that he had failed to comply with his contract " both as to progress and character of the work done under such contract, and also in not keeping the said work under your control," and that the notice was given for the purpose of laying the foundation for the forfeiture of said contract.

On August 1, 1894, appellant begun this suit to recover damages because of said attempted forfeiture, and because he was thereby prevented from complying with the contract, as well as to recover an amount exceeding $6,000, which it is claimed was due him for work actually done before the attempted forfeiture. The declaration consists of four original and seven additional counts, some of which declare generally as for breach of contract, others being the common counts, and the remainder declaring specially upon the contract as for breaches thereof by appellee, by reason whereof appellant was deprived of large profits he might have made. The general issue was pleaded, and a special plea of set-off for damages, alleging failure on the part of

Harlev v. Sanitary District of Chicago.

Harlev to perform his contract, and a plea of the statute of limitations, to the additional counts, to which latter plea a demurrer was sustained. A trial was had, commencing September 18th and concluding October 21, 1901, which resulted in a verdict directed by the court at the close of all the evidence, there being no evidence offered by the appellee on the question of damages, and a judgment thereon for costs against the plaintiff, from which this appeal was taken. No question is made regarding the pleadings. A motion was made by the appellee, at the close of the plaintiff's evidence, to direct a verdict for the defendant, but the court postponed the decision of that motion in order that the defendant might introduce such testimony as it desired which did not appertain to the question of damages. Such evidence was introduced by defendant. The motion was renewed at the close of all the evidence, and sustained.

WING & CHADBOURNE, EDWIN WHITE MOORE, JOHN J. COBURN and JOSEPH MCCALLUM, attorneys for appellant.

The engineer is not authorized by the contract to pass upon the right of forfeiture. Lauman v. Young, 31 Pa. St. 306; Velsor v. Eaton, 14 N. Y. Supp. 467; Boyd v. Meighan, 48 N. J. L. 404; Gubbins v. Lautenschlager, 74 Fed. Rep. 168; McGovern v. Backius, 10 Phila. 438; Michigan Ave. M. E. Church v. Hearson, 41 Ill. App. 89; Charlton v. Scoville, 39 N. E. Rep. (N. Y.) 394; Drhew v. Altoona, 121 Pa. St. 420; Dubois v. Del. & Hudson Canal Co., 12 Wend. 339; Mills v. Weeks, 21 Ill. 569; Bonnet v. Glattfeldt, 120 Ill. 166; Wait's Engineer & Arch. Jurisp., Sec. 370–397.

The right of forfeiture must be exercised promptly or it will be held to be waived. Lauman v. Young, 31 Pa. St. 306; Cree v. Bristol, 33 N. Y. Supp. 19; Linch v. Paris Lumber & Grain Co., 80 Texas, 23.

The words "as soon as possible" in a contract, signify in a reasonable time in view of the circumstances, or as soon as practicable. 2 Bouvier's Dict.; 23 Am. & Eng. Ency. of Law, 1st Ed. 839; Hydraulic Eng. Co. v. McHaffie, L. R. 4, Q. B. Div. 673; Pope v. Filley, 3 McCreary (U. S.) 190;

Robinson v. Brooks, 40 Fed. Rep. 525; Palmer v. Ins. Co., 44 Wis. 208; Atwood v. Emery, 1 C. B. N. S. 110; Pa. R. Co. v. Reichert, 58 Md. 261; Adams v. Foster, 59 Mass. (5 Cush.) 156; Hinds v. Kellogg, 13 N. Y. Supp. 922; Florence G. E. L. & P. Co. v. Hanby, 13 South. Rep. (Ala.) 348.

The acts of a party under a contract can not change or qualify its terms. Such acts may be resorted to only as a means of construction when the language of the contract is ambiguous. Stewart v. Lehigh Valley R. R. Co., 37 N. J. L. 53 ; Davis v. Sexton, 35 Ill. App. 410 ; Russell v. Young, 36 C. C. A. 71.

Where the language of a contract is ambiguous, it should be construed against the party drawing it where the opposite party had no choice as to form or phraseology. Jones on Construction of Contracts, 311; Otis v. United States, 20 Ct. Cl. 315; Hill v. King Mfg. Co., 79 Ga. 105; Norton v. Brophy, 56 Ill. App. 661.

" And " can not be construed as " or " in any written instrument unless necessary to effectuate the intention of the parties as expressed clearly, taking the instrument as a whole. This rule of construction is rarely, if ever, applied to a contract. Douglass v. Eyre, Gilp. (U. S.) 147; Fredenburg v. Turner, 37 Mich. 402; Hale v. Sweet, 40 N. Y. 97 ; Siegel, Cooper & Co. v. Colby, 176 Ill. 214 ; Packer v. Roberts, 140 Ill. 9.

JAMES TODD and PATRICK C. HALEY, attorneys for appellee; WALKER & PAYNE, of counsel.

MR. JUSTICE WINDES delivered the opinion of the court.

The principal and controlling question in this case is as to whether the appellee, by its proceedings looking to a forfeiture of the contract between it and Harlev, set out in the statement, was justified. If the contract was rightfully forfeited, then there is no right of recovery shown, and the learned trial judge committed no error in directing a verdict for appellee. No contention is made on behalf of appellee but that a *prima facie* case for appellant is shown by the evidence, except upon the theory that

appellant had not complied with his contract as to the rate of progress of his work thereunder.   No claim is made in the argument for appellee, that there was any right of forfeiture by reason of the failure of Harlev to comply with the provisions in the contract, viz: Division " D " No. 20 of the specifications with regard to the character of the work and in keeping the same under his control—not subletting all or any part of it, and Division " M," which provides, among other things, that Harlev should not lose control of the work from any cause; nor is any claim made that he failed to comply with any other provision of the contract, except that relating to his rate of progress.

We have set out in the statement many of the provisions of the contract which have no direct bearing upon the decision of the case, in view of the conclusions reached by us, so that the magnitude of the undertaking, the many and formidable difficulties to be met in its performance, and the necessity for careful and deliberate procedure on the part of the representatives of appellee in its efforts to forfeit the contract, may be made to clearly appear and be appreciated.

It is well settled and needs no citation of authorities to sustain the proposition, that forfeitures are not favored by the law, and that when the right thereto is asserted, such right must be clearly and unquestionably established before the courts will enforce them.

It appears from the evidence that Harlev, in the performance of his contract, had cleared about 170 acres of land included in the canal right of way of section one, which was covered with a dense growth of timber—very many large trees and underbrush, had removed most of the stumps and grubbed a large portion of it, all of which the evidence tends to show was necessary to be done in order to comply with the contract.   Section 8 of the specifications, quoted in the statement, makes it the duty of the contractor to " remove all trees, stumps, buildings, fences, or other incumbrances within 150 feet of the center line of the channel, or that may be in the way of any collateral

or subsidiary work herein specified." He had consumed in doing this work, some ten months and upward of time, at least four months of it being when a large part of the ground was flooded by water or the ground was frozen, making it impossible to do parts of this work, and impracticable to do any of it when the ground was so frozen or flooded. It also appears that in doing this clearing and grubbing, he had from 75 to 130 men employed, and that they worked in shifts, night and day. Also, there is much evidence that the number of men employed was all that could practically, reasonably and profitably have been employed in the doing of this work. Many men of experience in such matters testified, in effect, that employing all the men who could economically and profitably have worked on the land in clearing it and disposing of the timber, it would require from seven to ten months to do the work, some of the witnesses putting the time as high as twelve months.

Before the attempted forfeiture Harlev had excavated from the main channel 109,540 cubic yards of glacial drift, and before the contract of August 30, 1893, by which he was relieved of the construction of the river diversion, he had excavated on that part of his contract some 6,000 cubic yards of glacial drift. After making the contract of August 30, 1893, at the request of appellee, Harlev used the greater part of his working force in the construction of the river diversion, which he completed November 16, 1893. The total amount of excavation of glacial drift taken from the river diversion, and which, it appears, was necessary to have been done before any work of consequence was done upon the main channel, was 164,493 cubic yards. As early as November, 1893, appellant had and was using in the work on the main channel two steam shovels, a sixty horse-power engine, dumb carts, cables and inclines to pull the dirt from the shovels, three steam centrifugal pumps and other engines, about sixty wheel scrapers, some slip scrapers and wheelbarrows, shovels and picks to run 3,000 men. He also had buildings to lodge the men, barns for the horses,

an office building, tool house, blacksmith shop, three sets of blacksmith's tools, a boarding house and kitchen.  Two steam shovels would excavate from 1,500 to 2,000 cubic yards per day, and while the evidence shows they did not excavate that amount following the month of November, 1893, and up to the time of the attempted forfeiture, appellant was building a levee to protect the work which, it seems, was necessary and he was required to do under his contract.

There is evidence tending to show that appellant did not, after he begun active work in excavating on the main channel, which was in June, 1893, proceed as rapidly and diligently as the plant and means to prosecute the work that he had provided for that purpose, would seem to have enabled him to do, and certainly he did not succeed in making the progress that was deemed necessary, under the contract, by the chief engineer of appellee and his assist- .ants and by appellee's board of trustees.  There is, how- ever, ample evidence indicating that appellant in good faith was proceeding, and did proceed, up to the time of the attempted forfeiture, to carry out his contract according to its terms.  In a report as to progress on many sections of the canal, including section 1, made by the superintendent of construction to the chief engineer July 26, 1893, it is stated that the contractors on section 1 "are making more determined efforts to open up this work, and evince a dis- position to do all in their power to comply with their con- tract."  The evidence as to the actual amount of work done by Harlev, thereafter and up to the time of the attempted forfeiture, both in the river diversion and the main chan- nel evinces a continuance of this same disposition.  If this is true, certainly, in all fairness and justice, he should not by a forfeiture of the contract be deprived of his right to complete it and of any supposed benefits or profits that he might have gained therefrom, unless some rule of law, under the clear provisions of the contract, construed unfavorably to a forfeiture, demands such a result.

There being no claim by appellee that there was any

basis for its attempted forfeiture of the contract, except
on account of the alleged failure of Harlev to make the
rate of progress required, we are of opinion, from a con-
sideration of the whole evidence, that claim is untenable.
Even if it be conceded, as is contended by appellee (which
we do not) that the chief engineer was empowered, under
the contract, to decide whether appellant made the requi-
site rate of progress, that the chief engineer was justified
by the facts in so deciding, and that the evidence in this
record shows that appellant failed to make the rate of
progress required by the contract, still appellee had no
right to forfeit the contract.   The only provisions in the
contract which confer any power of forfeiture are in
Division " D," No. 20, of the specifications.   These provi-
sions give the appellee the right, at its option, to declare a
forfeiture, first, in case appellant should sublet " the work
covered by this contract, or any part thereof," and, second,
in case appellant " fails to comply with the provisions of
this contract as to progress and character of work."   No
claim is made of any right to forfeit under the first of these
provisions, but only under a part of the second provision,
namely, as to *progress of work*.   The obvious meaning of
the second provision, the conjunctive "and" being used
between the two words "progress" and "character," is
that there must be a failure on the part of the contractor
to comply with the contract, not only as to the progress of
the work, but also as to the character of the work.   The
default must be as to both together.   Neither the one nor
the other separately would be cause for a declaration of
forfeiture.   There is no uncertainty nor ambiguity about
the language of the contract relating to forfeiture, and in
fact there is nothing contained in the contract, which has
been pointed out or which we have been able to discover,
that, in our opinion, shows either of the parties had any
other intention than is indicated by the obvious mean-
ing of the words used—the meaning we have attributed to
them.   The appellee has attributed the same meaning to
this provision.   In the notice of its clerk to Harlev as to

the attempted forfeiture, December 28, 1893, the form of which was recommended by a committee of six of appellee's board of trustees, it is stated there was a failure to comply with the contract in two respects, viz: first, "as to *progress and character* of the work done," and, second, "in not keeping the said work under your control." 1 Chitty on Contracts (11 Am. Ed.), 113; 2 Parsons on Contracts, Sec. 497; Secombe v. Edwards, 28 Beav. 440; Packer v. Roberts, 140 Ill. 9–15; Hale v. Sweet, 40 N. Y. 97–100; Fredenburg v. Turner, 37 Mich. 402–5.

The language and different provisions of the contract in this regard being plain and certain, there is no room for construction, and it only remains for the court to enforce the contract as the parties have made it. No authorities cited by the learned counsel for appellee conflict with the foregoing conclusions. In view of these conclusions, it is unnecessary to discuss other points relating to the attempted forfeiture argued by the respective counsel.

The attempt by appellee to forfeit the contract being without sufficient basis, it only remains to be considered whether appellant has by his evidence made such a case as should have been submitted to the jury.

In considering this phase of the case, no question as to the weight or preponderance of the evidence, nor as to the credibility of the witnesses arises, since we can not, nor could the trial court, in passing upon the motion to take the case from the jury, weigh the evidence. The case should have been submitted to the jury if the evidence, all considered, without reference to any question of conflict in it, was such that the jury could, without acting unreasonably in the eye of the law, have decided in favor of the plaintiff. Bartelott v. International Bank, 119 Ill. 259, and cases cited; Offutt v. World's Col. Expn., 175 Ill. 472–5; Westville Coal Co. v. Schwartz, 177 Ill. 272–7; St. Louis Nat. Stock Yards v. Godfrey, 198 Ill. 288–92; Chicago City Ry. Co. v. Martensen, 198 Ill. 512.

The motion of appellee, made at the close of the plaintiff's evidence, and renewed at the close of all the evidence,

sets out at length and with great particularity, the grounds of the motion. Aside from certain questions of alleged variance between the pleadings and the proof, and a failure of plaintiff to plead certain alleged conditions precedent, none of which are argued nor relied upon in this court, and are therefore considered as waived and abandoned, the motion and grounds thereof relate solely to the claim that, under the evidence, the plaintiff had failed to make the requisite rate of progress, that the chief engineer of appellee had so decided and certified to appellee, and that this decision and action of the chief engineer was final and conclusive as between the parties.

In this connection it should also be recalled that no claim is made that the character of appellant's work did not comply with the contract, nor that he committed any breach thereof by subletting all or any part of the work thereunder, nor that there was any other breach on appellant's part of any other provision thereof, except as to rate of progress in the work.

It should also be remarked that from an examination of the evidence in all these respects, save as to the rate of progress, we are of opinion that there is not only an absence of sufficient evidence to show a breach of the contract by appellant, but, on the contrary, the evidence tends to show a substantial compliance therewith and a *prima facie* case for appellant, with the exception noted. To refer to this evidence, which is very voluminous, in detail, would unduly extend this opinion. Has the plaintiff failed to make a case which should have been submitted to the jury, as to the rate of progress in the work, is the sole question which remains to be considered.

There is no provision of the contract which in terms directs how the rate of progress in the work was to be determined. Division " G " of the contract quoted in the statement provides that the work should commence within thirty days after its execution, or as soon thereafter as appellee should have acquired title to the necessary right of way and shall have notified appellant to begin, should

be completed on or before April 30, 1896, and, among other things, that "the work done each month shall not be less than such proportion of the whole work as one month bears to the total number of months agreed upon for the completion of said work; provided, that the first four months after notice to begin shall be considered as one month, and the last two months before date of completion as one month."

Notice was given to appellant November 26, 1892, to commence work on the river diversion, and on December 17, 1892, to commence work in the main channel, but at neither of these dates had appellee acquired possession of all its right of way in section 1; and it is not claimed by appellee that the work should have commenced at an earlier day than January 1, 1893. Appellant, however, did some work in clearing off the timber in December, 1892, and some work in excavation in the main channel in January, 1893, but on the latter work did not make material progress until June, 1893, because most of the time from and including January, 1893, until the following June, the ground was either frozen or flooded with water, which made excavation to any extent during that period impracticable. What progress was thereafter made until the attempted forfeiture, February 10, 1894, has been stated. Division "B" of the contract is, viz:

"It is further covenanted, contracted and agreed that the work shall be executed under the direction and supervision of the chief engineer of the Sanitary District of Chicago, and such assistants, superintendents and inspectors as the chief engineer may appoint, and by whose measurements and calculations the quantities and amounts of the several kinds of work performed under this contract shall be determined, and on whose inspection all work shall be accepted or condemned. The said chief engineer and his assistants and inspectors shall have full power to reject or condemn all materials furnished or work performed under this contract which do not fully conform to its spirit and to the terms and conditions herein expressed, and the chief engineer shall decide every question which may arise between the parties hereto relative to the execution thereof, and his decision shall be final and binding upon both parties."

It is claimed that the rate of progress in the work having come in question between the parties, the chief engineer, by the last clause of this provision, was empowered to decide the question, and his decision on that matter having been adverse to appellant, is final and conclusive and can not be questioned in this case.   We think otherwise.   The contract was prepared by appellee and must be construed strictly against it.   When this division of the contract is read as a whole, we are of opinion it has no reference to the rate of progress of the work, but only to the character and amount of work and materials, with reference to whether the same were done and furnished in accordance with the contract, looking to its final completion and to payment therefor.   Had it been intended that the decision of the chief engineer should bind the parties as to the rate of progress, words to that effect would undoubtedly have been used in the provisions of the contract which mention the rate of progress.   Moreover, if his decision in that regard was intended to bind the appellee, we are inclined to think that Division " N," which contains several general stipulations, would not have contained the following provisions, viz :

"Provided that nothing herein contained shall be construed to affect the right hereby reserved of the said party of the first part to reject the whole or any portion of the aforesaid work, should the certificate be found to be inconsistent with the terms of this agreement, or otherwise improperly given."

A reading of the preceding part of this provision shows that the certificate referred to is the certificate of the chief engineer given as to a compliance by appellant with " each and all of the stipulations hereinbefore mentioned."   This general and sweeping language quoted clearly covers not only every stipulation in Division " B " of the contract, but also every other preceding stipulation of the contract. This being true, and it is, in our opinion, a fair and natural construction of Division " N," it follows that no decision as to rate of progress, or of any other matter relating to the contract, which the chief engineer might make, would

have been binding upon appellee, and consequently it would not have been binding upon appellant. It is fundamental that a contract of this kind, to be valid, must be binding upon both parties. We therefore are of opinion that the alleged decision of the chief engineer as to appellant's rate of progress on the work was of no effect in controlling the rights of the parties to the contract. Appellant, then, not being affected by the chief engineer's decision, does the evidence show a failure by appellant to make the rate of progress on the work required by his contract? There is extended argument, both on behalf of appellant and appellee, as to the time when, under the contract and the notice given by appellee, appellant should have commenced work on the main channel, in so far as that time furnishes a basis for computing the rate of progress, namely, as to whether he should have commenced January 1 or July 1, 1893, or after the river diversion was completed, November 16, 1893. It is claimed by appellant that if it be held that he should have commenced work either on January 1 or July 1, 1893, the rate of progress which he made, as shown by the evidence, estimating it according to a fair and reasonable construction of the contract, including all the different kinds of work required to be done thereunder, was such as to show, not only that there was no breach of the contract on his part as to rate of progress, but that it shows a compliance by him in that regard with the contract up to the time of the attempted forfeiture. It seems unnecessary to decide either of these claims, as we think the contract, in view of the evidence, shows that he was not required to commence work on the main channel until the river diversion was completed, namely, November 16, 1893. If he was not required to commence on the main channel until this date, then his rate of progress should be estimated commencing at that date.

Division "G" of the contract, after providing for the time of commencement of the work as hereinbefore stated, has the following provision, viz:

" Provided that only such work as building levees, chang-

ing river channels, grading roadbeds, and other subsidiary work, where the necessary land has been acquired, shall be required of said contractor until it is possible to open the main excavation at the best point from which to execute the said work."

The words "changing river channels" clearly refer to that part of the work called river diversion. The evidence shows that the main channel was subject to overflow from the Desplaines river, especially during the early summer and spring months, and in order to protect work being done in the main channel, before the construction of the river diversion, it was necessary to build levees around it at great expense. These levees would have to be removed after the completion of the main channel. All this expense could have been obviated, as the evidence fully establishes, by building the river diversion before excavating the main channel. Quite a number of engineers of wide experience testified, in effect, that as a business proposition, it was impracticable to excavate the main channel before the construction of the river diversion, because of the large expense made necessary by the construction of levees to protect the work, and if the river diversion was first made, that would render unnecessary the expense of the levees. That it was necessary to build the river diversion first, is also made plain by communications which appear in the record of the chief engineer and his assistants, made to the board of trustees of appellee before that work was done, and by the further fact, which also appears and is hereinbefore referred to, that when appellee made theag reement of August 30, 1893, with appellant to superintend the work of the river diversion, he, at appellee's request, used the main part of his working force on the river diversion and completed it in about two and one-half months.

The word "possible," as used in the provision quoted, should, in our opinion, be construed as meaning or in the sense of "practicable." To construe it in any other sense would make this provision of the contract very unreasonable, if not unnecessarily oppressive to the contractor. Palmer v. Ins. Co., 44 Wis. 208; Pa. R. R. Co. v. Reichert,

58 Md. 261; Guild v. Hale, 15 Mass. 455–7; Adams v. Foster, 59 Mass. (5 Cush.) 156; Florence, etc., Co. v. Hanby, 13 S. Rep. (Ala.) 348; 1 Amer. & Eng. Ency. of Law, 777, and cases cited; 2 Parsons on Contracts, p. 497 (6th Ed.); 1 Chitty on Contracts, p. 114 (11 Amer. Ed.).

In the Palmer case, *supra,* the Supreme Court of Wisconsin, in construing the phrase " as soon as possible " in an insurance contract, held that it meant " as soon as it could be, under the circumstances, or within a reasonable time, or as soon as practicable."

In the Reichert case, *supra,* the Supreme Court of Maryland, in construing a contract by which the railroad company undertook to build for appellee "*forthwith*" a trestle with dumps and bins for unloading coal, held that the term *forthwith* meant *in a reasonable time.*

In the Hanby case, *supra,* the Supreme Court of Alabama, in construing a contract to construct and erect an electric light plant which contained, among others, a stipulation that the plant should be erected " as soon as possible," held that these words should be construed " to require the erection and construction of the plant complete within a reasonable time, or within such time as was reasonably necessary, under the circumstances, to do what the contract required to be done." To like effect in principle are the other authorities cited.

In estimating the rate of progress, appellee's engineers considered only that kind of work required by the contract, for which a specific price is fixed, viz : the excavation of glacial drift and solid rock and the building of retaining walls. This mode, we think, is manifestly wrong and worked a great injustice to appellant. But if it be conceded to be a correct mode, still the work done by appellant as shown by the evidence, the rate of progress being estimated from November 16, 1893, was, in our opinion, sufficient to show compliance by him with the contract in that regard. To discuss the great volume of evidence in this regard would require unnecessary labor. This mode was, however, a wrong one for the reason that everything

required by the contract to be done by the contractor and thereby classed *as work* should be taken into consideration in any fair and just method of estimating a rate of progress, whether a specific price is provided by the contract to be paid for such work or not. The provision of the contract in regard to the amount of work to be done each month, namely, Division " G," has been quoted. It refers to the *whole work*. It is conceded that in estimating the rate of progress, the contractor should do each month one-forty-first part of the whole work. If he should carry on each kind of work simultaneously, necessarily he would be required to do one-forty-first of each kind of work; but the contract does not require him so to do. So far as the terms of the contract are concerned, he was at liberty to do as much or as little of each kind of work as he chose each month, provided he did one-forty-first of the whole work each month. Division " D " No. 8, quoted in the statement, provides that appellant should clear away the trees and stumps and grub the right of way, and it is designated and referred to *as work* in several different places in the contract, though no specific price is named for doing it, and No. 18 of said Division " G " has this clause, to-wit :

" The prices given herein are to include all work herein specified and the clearing and grubbing, levees for protection, pumping, roadways for working, back filling for retaining walls and generally all work and material found necessary in prosecuting this contract."

Much of the evidence shows that to do this clearing and grubbing would necessarily require, using all the force that could be safely, reasonably and economically employed at the work, from seven to ten months, some of the witnesses stating it as high as twelve months. It would be obviously unfair and unjust to exclude all this work in estimating the monthly rate of progress. If it is included, as many of the witnesses testify is the rule in estimating the rate of progress under like contracts, then it is clear from the evidence that appellant complied with his contract as to rate of progress, whether either November 16 or July 1, 1893, be taken as the proper date to commence the esti-

mate.  Indeed, we are not prepared to hold that if January 1, 1893, the date from which appellee claims the rate of progress should be estimated, be taken as the correct one, appellant has not shown a compliance with the contract.  Whether or not appellant showed such compliance, was a question which, in our opinion, should have been submitted to the jury.  We think the correct date from which the estimate should be made, is November 16, 1893.

For the error in directing a verdict for defendant, the judgment is reversed and the cause remanded.